# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JANICE C. PINI,                     )
                                    )
        Plaintiff,                )
                                    )
v.                                  )          2:12-cv-00698
                                    )
FIRST UNUM LIFE INSURANCE           )
COMPANY, THE CA, INC. GROUP         )
LONG TERM DISABILITY PLAN,          )
AND CA, INC.,                       )
                                    )
        Defendants.               )


## MEMORANDUM OPINION

Before the Court for disposition are the Plaintiff's MOTION FOR SUMMARY

JUDGMENT (*ECF No. 29*), the Plaintiff's Concise Statement of Material Facts (*ECF No. 30*),

the Plaintiff's Exhibits in Support of Motion for Summary Judgment (*ECF Nos. [30-1]-[30-12]*),

the Plaintiff's Brief in Support of Motion for Summary Judgment (*ECF No. 31*), the Defendants'

MOTION FOR SUMMARY JUDGMENT (*ECF No. 32*), the Defendants' Brief in Support of

Motion for Summary Judgment (*ECF No. 33*), the Defendants' Concise Statement of Material

Facts (*ECF No. 34*), the Administrative Record (*ECF Nos. 35-[35-17]*), the Plaintiff's Brief in

Opposition to the Defendants' Motion for Summary Judgment (*ECF No. 38*), the Plaintiff's

Response to the Defendants' Concise Statement of Material Facts (*ECF No. 39*), the Defendants'

Brief in Opposition to the Plaintiff's Motion for Summary Judgment (*ECF No. 40*), the

Defendants' Response to the Plaintiff's Concise Statement of Material Facts (*ECF No. 41*), and

the Plaintiff's Reply to the Defendants' Responsive Brief (*ECF No. 42*).  For the reasons that

follow, the Plaintiff's Motion for Summary Judgment (*ECF No. 29*) will be denied, and the

Defendants' Motion for Summary Judgment (*ECF No. 32*) will be granted.

## I.    Background

Plaintiff Janice C. Pini ("Pini") was hired to work as a Senior Principal Product Manager for CA, Inc. ("CA"), on March 29, 2004.  ECF No. 41 at ¶ 1.  In that capacity, she was "responsible for driving strategy and requirements for multiple major product lines."  ECF No. 35-4 at 40.  The position required Pini to spend roughly 50% of her time traveling.  *Id.* at 41.

As an employee of CA working in the United States, Pini participated in CA's Short-Term Disability Plan ("STD Plan").  ECF No. 41 at ¶ 6.  The STD Plan, which became effective on January 1, 2007, provides financial protection for CA employees by paying portions of their salary during periods of disability.  ECF No. 30-5 at 6.  Benefits available under the STD Plan are payable for a maximum period of twenty-six weeks from the date of an employee's disability.  *Id.*  The portion of the STD Plan defining the term "disability" provides as follows:

### HOW IS DISABILITY DEFINED FOR THE PLAN?

You are disabled when the Plan Administrator determines that:

- you are Limited from performing the Material and Substantial Duties of your Regular Occupation due to your Sickness or Injury; and
- you have a 20% or more loss in Weekly Earnings due to the same Sickness or Injury.

**LIMITED** means what you cannot or are unable to do.

**MATERIAL AND SUBSTANTIAL DUTIES** means duties that:

- are normally required for the performance of your Regular Occupation; and
- cannot be reasonably omitted or modified, except if you are required to work on average in excess of 40 hours per week, the Plan will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

**REGULAR OCCUPATION** means the occupation you are routinely performing when your disability begins.  The Plan Administrator will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

*Id.* at 7 (boldface type and capitalization in original).  The STD Plan is an unfunded, self-insured plan.  ECF No. 41 at ¶ 6.  Benefits provided under the STD Plan are paid from CA's general assets.  *Id.*  The day-to-day administration of the STD Plan is controlled by First Unum Life Insurance Company ("Unum").  *Id.* at ¶¶ 7-8.

Pini also participated in CA's Group Long-Term Disability Plan ("LTD Plan").  ECF No. 41 at ¶ 12.  Unum administers the LTD Plan.  *Id.* at ¶ 14.  The LTD Plan is funded by insurance issued by Unum.  *Id.* at ¶ 13.  The LTD Plan defines the term "disability" as follows:

**HOW DOES UNUM DEFINE DISABILITY?**

You are disabled when Unum determines that:

- you are limited from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
- you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

You must be under the regular care of a physician in order to be considered disabled.

\*\*\*

**MATERIAL AND SUBSTANTIAL DUTIES** means that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified.

\*\*\*

**REGULAR OCCUPATION** means the occupation you are routinely performing when your disability begins.  Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

ECF No. 1-1 at 13, 27, 29 (boldface type and capitalization in original). As the foregoing language illustrates, the definition of the term "disability" contained in the LTD Plan is not significantly different from that found in the STD Plan.

Pini apparently clashed with her male supervisor during the spring of 2009. ECF No. 35-6 at 5-6. Although the supervisor did not engage in any forms of sexual harassment or gender-based discrimination, he allegedly created an atmosphere of "intimidation and ridicule." *Id.* at 6. The supervisor's aggressive management style supposedly put Pini in a "hellish situation" and made her work experience very stressful. *Id.* at 5.

On June 6, 2009, Pini felt pressure in her chest, shoulder and jaw while watching a televised hockey game involving the Pittsburgh Penguins. ECF No. 35-2 at 51; ECF No. 35-6 at 5. Believing that the symptoms were attributable to a muscle pull, she "laid down and got drowsy." ECF No. 35-6 at 5. After awakening during the early morning hours of June 7, 2009, Pini continued to experience the same symptoms. *Id.* She went to the emergency room at Canonsburg General Hospital for treatment. ECF No. 35-2 at 51. Because Pini had elevated cardiac enzymes and chest pain, she was transferred and admitted to St. Clair Hospital for "more definitive therapy." *Id.*

Dr. Adil Waheed, a cardiologist, performed a cardiac catheterization on Pini. ECF No. 41 at ¶ 21. The procedure left Dr. Waheed with the impression that Pini was suffering from Takotsubo cardiomyopathy, which is a stress-induced heart condition.[1] ECF No. 35-2 at 20. Since Pini had suffered a myocardial infarction, an echocardiogram was performed on June 8, 2009. *Id.* at 48. Aside from some "regional wall motion abnormalities" in Pini's left ventricular chamber, the test yielded normal results. *Id.* Pini was discharged the next day. *Id.* at 50. She

---

[1] Pini was fifty-seven years old at the time of her cardiac event. ECF No. 35-2 at 51.

started to attend sessions with Kristin Kristoff ("Kristoff"), a stress management therapist, on June 16, 2009.  ECF No. 35-4 at 25.

Since she was unable to return to work in the immediate aftermath of her cardiac event, Pini applied for benefits under the STD Plan.  ECF No. 35-2 at 26-31.  Dr. James Moretti, Pini's primary care physician, was asked to submit a statement describing her work-related abilities and limitations.  In a statement dated June 22, 2009, Dr. Moretti informed Unum that Pini had suffered an acute myocardial infarction, and that she could not engage in "heavy lifting."  *Id.* at 11-12.  Dr. Moretti further reported that Pini was expected to return to work on July 19, 2009.  *Id.*  On July 7, 2009, Unum found Dr. Moretti's opinion to be supported by the documentary evidence of Pini's treatment.  ECF No. 35-4 at 27.  Pini's application for benefits was approved.

Unum sought additional information from Dr. Moretti on July 17, 2009.  ECF No. 35-2 at 15.  In response to Unum's inquiry, Dr. Moretti advised that Pini needed to remain "off of work indefinitely."  *Id.*  After performing a follow-up examination of Pini on July 20, 2009, Dr. Waheed informed Dr. Moretti that Pini's "overall clinical history" suggested that she had suffered a stress-induced cardiomyopathy.  *Id.* at 51.  On August 4, 2009, Kristoff reported that Pini should not return to a high-stress "corporate environment."  ECF No. 35-3 at 11.  The information provided by Pini's treating sources convinced Unum to continue her benefits for a few additional weeks.  ECF No. 35-4 at 31.

In a letter to Dr. Moretti dated August 20, 2009, Dr. Waheed stated that Pini had experienced "episodes of chest pain and jaw pain" during her cardiac rehabilitation sessions.  ECF No. 35-3 at 37.  Dr. Waheed suggested that Pini's recurrent chest pain was attributable to coronary spasms.  *Id.*  He also opined that she was suffering from acute systolic heart failure and hypothyroidism.  *Id.*

Pini experienced chest pain on September 7, 2009. ECF No. 39 at ¶ 10. She was

admitted to St. Clair Hospital later that day. *Id.* Dr. David Burkey, a treating cardiologist,

observed that Pini's chest pain was "possibly anginal in nature." ECF No. 35-4 at 2. A stress

nuclear study yielded normal results. *Id.* at 2-3. In light of Pini's prior myocardial infarction,

however, Dr. Burkey was concerned that "another event" could occur. *Id.* at 3. Pini was

discharged on September 8, 2009. ECF No. 41 at ¶ 34. Ten days later, Kristoff informed Unum

that Pini was participating in a treatment plan designed to "decrease her anxiety and stress

levels." ECF No. 35-4 at 7. On September 24, 2009, Unum employees decided to procure

treatment notes documenting the severity of Pini's symptoms. *Id.* at 33.

Unum personnel apparently sought further information about Pini's medical condition.

John Merrifield ("Merrifield"), a Unum employee, was evidently responsible for obtaining that

information. In a letter to Merrifield dated September 30, 2009, Dr. Waheed briefly described

the history of Pini's treatment. ECF No. 35-4 at 18-19. Dr. Waheed summarized his conclusions

by stating as follows:

> In summary, Janice Pini has a stress induced cardiomyopathy also known as
> takotsubo syndrome. This has been documented in the medical literature to be
> related to significant periods of stress and anxiety. Physical activity in itself is not
> a contributing factor but stressful situations are. She needs to avoid situations
> where this can be a problem as patient's [sic] with this condition can be plagued
> with relapses. Fortunately, the most recent stress test and echocardiogram
> showed complete recovery in LV function. I think, if anxiety and stressful
> situations cannot be avoided in her work environment, she would not be able to
> perform this job any further.

*Id.* Although Merrifield had requested information about Pini's physical limitations, Dr. Waheed

advised that Pini's "main problem" was not related to her physical activities. *Id.* at 18.

Dr. Moretti provided Merrifield with additional information in a letter dated October 2,

2009. ECF No. 35-4 at 13-14. In his letter, Dr. Moretti explained that Pini had been cleared "to

resume her prior levels of physical activity" after her September 8, 2009, release from St. Clair

Hospital. *Id.* at 13. Discussing Pini's work-related abilities, Dr. Moretti made the following

observations:

> Based on discussions with Janice, it is clear that her current job as Senior
> Principal Product Manager at CA, Inc. is the primary source of her previous high
> stress levels. Since being off work due to her heart attack, and with the
> introduction of Lexapro, Ativan and stress management counseling, her stress
> levels have reduced. Even with reduced stress levels, her coronary spasms
> continue to cause angina symptoms which have high potential to cause another
> heart attack.
>
> It is my recommendation that Janice not return to any line of work that includes
> moderate to high stress levels, including deadlines, high work loads, or office
> "political" environments.

*Id.* at 14. Copies of Pini's test results were sent with Dr. Moretti's letter. *Id.*

Jayne S. Pasquali ("Pasquali"), a Disability Benefits Specialist for Unum, sought follow-

up information from Dr. Waheed. In a written inquiry dated October 14, 2009, Pasquali

described Takotsubo cardiomyopathy as "a transient disorder and a reversible condition." ECF

No. 35-4 at 22. She further stated that Pini's medical problem appeared to be "psychological in

nature." *Id.* In response to a series of written questions sent by Pasquali, Dr. Waheed expressed

concern that Pini's work environment at CA was sufficiently "intense" to "cause a relapse." *Id.*

When asked to identify the "specific stressors" impacting Pini's functional capacity, Dr. Waheed

made reference to Pini's interactions with her supervisor. *Id.* at 23. Dr. Waheed opined that Pini

would be alright if she managed to avoid the stress associated with her position at CA, and that

she "should be able to" perform the duties of her occupation for a different employer. *Id.* The

form conveying Dr. Waheed's responses to Pasquali's questions was completed on October 15,

2009. *Id.*

In a letter to Merrifield dated October 21, 2009, Kristoff stated that Pini "continue[d] to experience angina symptoms caused by coronary spasms and related to stressful events." ECF No. 35-4 at 25. Discussing Pini's ability to function in a work environment, Kristoff went on to make the following observations:

> Based on our discussions during treatment, it is clear that Janice's current position as Senior Principal Product Manager at CA, Inc. has been the primary source of her high stress levels. Since her leave from work due to her heart attack, and with the introduction of medications (Lexapro and Ativan) and stress management counseling, her stress levels have mildly decreased. Even with this improvement, she has reported to me that her coronary spasms continue to cause angina symptoms that her physicians warn indicate a high potential for additional heart attack(s).
>
> Janice has been diagnosed with Acute Stress Disorder. It is my recommendation that she not return to any form of employment that includes moderate to acute stressors such as deadlines, continuous high work loads, and office environments that can be described as highly "political" and conflict-filled.

*Id.* at 25-26. Kristoff's comments about Pini's condition were substantially similar to the statements that had previously been made in Dr. Moretti's letter. *Id.* at 14.

Carol Fletcher ("Fletcher"), a vocational rehabilitation consultant for Unum, completed an occupational assessment of Pini's claim on October 30, 2009. ECF No. 35-4 at 37. After reviewing all relevant information, Fletcher concluded that Pini's position at CA had been consistent with the "product analyst" position listed as job #096.121-094 in the Dictionary of Occupational Titles ("DOT"). *Id.* at 44; ECF No. 41 at ¶ 51. Fletcher also reported that a product analyst was generally expected to work at an above-average pace, respond to constant deadlines, and handle high workloads. ECF No. 35-4 at 44. Unum ultimately decided to extend Pini's benefits under the STD Plan through December 5, 2009. *Id.* at 37.

In November 2009, Pini applied for benefits under the LTD Plan. ECF No. 39 at ¶ 18. Erin M. McDonald ("McDonald"), a Disability Benefits Specialist for Unum, telephoned Pini on

November 18, 2009, to discuss her claim. ECF No. 35-6 at 5-10. During the ensuing conservation, Pini stated that while she could still "go hiking" and engage in many of her prior activities, she was no longer able to work in a high-stress environment. *Id.* at 5. Pini further asserted that, prior to her initial cardiac episode, her supervisor at CA had been "taking everything out on her." *Id.* at 6.

Pini's claim was referred to Penny Letichevsky ("Letichevsky"), a senior vocational rehabilitation consultant, for an occupational assessment. ECF No. 41 at ¶ 63. Letichevsky determined that Pini's job at CA was comparable to the same "product analyst" position that had previously been identified by Fletcher. ECF No. 35-6 at 28. The position was described as one requiring an individual to influence the opinions, attitudes and judgments of others. *Id.* at 30.

The record indicates that Dr. Waheed examined Pini in December 2009. ECF No. 35-8 at 30-31. On that occasion, Dr. Waheed apparently told Pini that her chest spasms were not "bad enough to progress to a heart attack," and that they would "go away over time." *Id.* at 30. He suggested that she return to work as a product analyst and stop working if she encountered "more problems." *Id.* at 31. Pini responded to Dr. Waheed's suggestion by stating that she was not willing to incur the risk of another cardiac event. *Id.*

Dr. Costas Lambrew, a physician who is certified in internal medicine, works out of Unum's office in Portland, Maine. ECF No. 41 at ¶ 71. On December 9, 2009, Pini's file was forwarded to Dr. Lambrew for review. *Id.* at ¶ 70. The next day, Dr. Lambrew reported that Pini was physically capable of working as a product analyst. ECF No. 35-6 at 40. He did not express any opinions concerning her mental health. *Id.*

Dr. Nicholas B. Kletti specializes in psychiatry. ECF No. 41 at ¶ 83. He has been a full-time salaried employee of Unum's parent company since September 2006. *Id.* On December 23,

2009, Dr. Kletti was asked to review Pini's medical records and render an opinion as to whether she was suffering from a "psychiatric impairment." ECF No. 35-7 at 2. In connection with his review, Dr. Kletti sought further information from Dr. Moretti and Kristoff. *Id.* at 16-32. On a form provided by Dr. Kletti, Dr. Moretti stated that Pini did not have a psychiatric disorder. *Id.* at 31. He asserted that she needed to avoid stress in a more general sense. *Id.* at 32. After reviewing the relevant documentary evidence, Dr. Kletti opined that Pini had not established the existence of a "continuous psychiatric impairment" that would preclude her from performing full-time work in her "own occupation." *Id.* at 8. Dr. Kletti based his opinion on the idea that Pini had been "able to tolerate emotional and physical stress related to her day-to-day life without an impact on her cardiovascular status." *Id.* at 7.

During the afternoon of December 31, 2009, Kristoff left Dr. Kletti a voicemail message asking that he contact her. ECF No. 35-8 at 8. In her message, Kristoff stated that she preferred to convey her thoughts about Pini's condition over the telephone rather than in writing. *Id.* Dr. Kletti and Kristoff spoke about the matter on January 8, 2010. *Id.* The conversation lasted for roughly fifteen minutes. *Id.* Kristoff expressed disagreement with Dr. Kletti's conclusion that Pini could perform the duties of her job for a different employer. *Id.* The position taken by Kristoff was attributable to bouts of chest pain that Pini experienced whenever she had contact with her former workplace or thought about returning to work. *Id.* After speaking with Kristoff, Dr. Kletti adhered to his view that Pini had no "continuous psychiatric impairment precluding full-time work in [her] own occupation." *Id.* at 9.

In light of the disagreement between Dr. Kletti and Kristoff, Unum referred Pini's claim file to Dr. Stuart Shipko. ECF No. 41 at ¶ 98. Dr. Shipko was asked whether he agreed with Dr. Kletti's conclusion that Pini had no psychiatric impairment that would prevent her from working.

*Id.* at ¶ 99.  Based on his review of the evidence, Dr. Shipko expressed agreement with Dr. Kletti's opinion and rejected Kristoff's contrary assertion.  ECF No. 35-8 at 18-19.  In taking that position, Dr. Shipko observed that Kristoff had based her opinion on the presence of chest pain, which was beyond her "training and education."  *Id.* at 18.

Dr. Kletti and Dr. Moretti discussed Pini's claim on January 5, 2010.  ECF No. 35-7 at 48.  Dr. Moretti apparently stated that Dr. Waheed had "encouraged [Pini] not to let her symptom complaints interfere with [her] premorbid functional activities."  *Id.*  The record indicates that Dr. Moretti advised Pini to seek a second opinion from a different cardiologist in order to "alleviat[e] her understandable anxiety and concern about her chest pains."  *Id.*  In a voicemail message to McDonald recorded on January 7, 2010, Pini expressed an intention to "change cardiologists" because of her dissatisfaction with Dr. Waheed.  *Id.* at 50.

On January 11, 2010, Dr. Moretti contacted Unum about Pini's claim.  ECF No. 35-9 at 10.  Although Dr. Moretti acknowledged that Pini did not suffer from atherosclerotic coronary artery disease, he stated that "psychic stress" would exacerbate her coronary spasms.  *Id.*  Dr. Moretti further asserted that the "primary treatment" for Pini's condition was the "general avoidance of stress."  *Id.*  He insisted that she could not return to work.  *Id.*

McDonald telephoned Pini on January 12, 2010, to discuss the status of her claim.  ECF No. 41 at ¶¶ 103-106.  Pini expressed concern that Unum was focusing on psychiatric issues rather than on her stress-induced heart condition.  ECF No. 35-8 at 30.  Although Pini acknowledged that she did not have any "blockages," she maintained that stressful situations would increase her chances of having a heart attack.  *Id.*  Pini also expressed frustration that Dr. Waheed had been telling Unum that she could perform her duties for a different employer even though he had told her otherwise.  *Id.* at 30-31.

Updated medical records provided by Dr. Moretti were forwarded to Dr. Lambrew. ECF No. 41 at ¶ 107. After reviewing those records, Dr. Lambrew reiterated his view that Pini was physically capable of working as a product analyst. ECF No. 35-8 at 43. In support of his opinion, Dr. Lambrew explained that Pini was not complaining of dyspnea, fatigue or palpitations. *Id.*

Dr. Charles D. McDonald is a cardiologist employed by Unum. ECF No. 41 at ¶ 112. He works at Unum's office in Portland, Maine. *Id.* On January 13, 2010, Dr. McDonald was asked to render an opinion concerning Pini's physical abilities and limitations. *Id.* After reviewing the documentary evidence, Dr. McDonald stated that Pini was physically capable of working as a product analyst. ECF No. 35-9 at 11. In support of his conclusion, Dr. McDonald stated as follows:

> The medical records are not consistent with the classic description of Tsako-Tsubo cardiomyopathy. The claimant had normal left ventricular dimensions on 6/8/2009, and all subsequent testing has indicated normal left ventricular size. Apial ballooning was not described on the ventriculogram of 6/8/2009. Another likely explanation of this event would have been in-situ thrombosis related to hormone replacement therapy with a Premarin/progesterone combination pill. There is no documentation of evaluation for a hypercoagulable state.
>
> Nevertheless, the medical literature on Tsako-Tsubo cardiomyopathy indicates a 95% incidence of complete recovery in several months, if recognized early and appropriately treated. It is interesting that the literature on Tsako-Tsubo cardiomyopathy notes that 70-80% of the cases occur in postmenopausal women. The literature does not indicate how many of these cases were also on postmenopausal hormone replacement therapy.
>
> It is known that stress and anxiety can produce coronary spasm, but the coronary arteriogram performed on 6/8/2009 did not describe coronary spasm or any catheter-induced spasm. Provocative testing with ergonovine or acetylcholine was not performed.

*Id.* at 11-12. Dr. McDonald further declared that "recurrent events [we]re no more likely to occur at work than at home in patients with normal left ventricular function and no evidence of

myocardial ischema." *Id.* He pointed out that Pini's "initial episode" had occurred while she was at home. *Id.*

Dr. Moretti referred Pini to Dr. James MacDougall, a cardiologist, for a second opinion about her work-related abilities. ECF No. 41 at ¶ 119. Dr. MacDougall examined Pini on January 20, 2010. ECF No. 35-9 at 37. During the examination, Pini stated that her job at CA was "intensely stressful." *Id.* She expressed concern that a return to that work environment would result in a "recurrence of her cardiac problem." *Id.* In his report of the examination, Dr. MacDougall explained:

> A very lengthy discussion was held with the patient. Again she is quite concerned about the possibility of relapse of her cardiac event should she return to a stressful work environment. Given her history, this is certainly a reasonable concern. As such, her work future is uncertain.

*Id.* The examination left Dr. MacDougall with the impression that Pini was suffering from Takotsubo cardiomyopathy. *Id.* Pini was advised to "continue with her healthy lifestyle habits." *Id.*

After learning of the examination, McDonald asked Dr. MacDougall to provide Unum with information about Pini's medical condition. ECF No. 35-9 at 34-35. On a form supplied by Unum, Dr. MacDougall indicated that he was "supporting the patient's inability to work." *Id.* at 34. In response to an inquiry requesting information about specific work-related restrictions, Dr. MacDougall reported as follows:

> The patient's stressful work environment may have resulted in her cardiac event. Return to a stressful work environment may result in a relapse.

*Id.* The form completed by Dr. MacDougall was dated January 29, 2010. *Id.* at 35.

Pini's claim file was referred back to Dr. Lambrew for further review. ECF No. 41 at ¶ 122. On February 2, 2010, Dr. Lambrew opined that the diagnosis of Takotsubo cardiomyopathy was not supportable, since Pini had not experienced "cardiac enlargement during the acute event." ECF No. 35-9 at 41. Dr. Lambrew further stated that Dr. MacDougall had not offered any evidence of Pini's inability to return to her "usual occupation." *Id.* at 42.

Pini became concerned that Unum was "trying to turn [her case] into a psych issue rather than a medical issue." ECF No. 35-9 at 49. During a telephone conversation conducted on February 3, 2010, McDonald advised Pini that the impact of her "stress and anxiety" on her ability to work constituted the "psych component" of her case. *Id.* This discussion apparently prompted Pini to seek an opinion from a psychiatrist. *Id.* Dr. Jasbir Kang performed a psychiatric evaluation of Pini on February 16, 2010. ECF No. 41 at ¶ 132. The next day, on a form provided by Unum, Dr. Kang reported that Pini was "unable to work" because of her cardiac condition. ECF No. 35-10 at 24. Dr. Kang listed the "medical condition" previously diagnosed by Dr. MacDougall as his reason for finding Pini to be disabled. *Id.* It was also noted that some of Pini's work-related limitations were attributable to anxiety. *Id.*

On February 17, 2010, Dr. Lambrew and Dr. MacDougall spoke about Pini's claim by telephone. ECF No. 41 at ¶¶ 124-125. In a letter to Dr. MacDougall recounting the conversation, Dr. Lambrew made the following comments:

> I noted I had reviewed your second opinion note dated 1/20/10, your impression that she had a history of Taskotsubo Cardiomyopathy, and your subsequent response on 1/29/10 in which you supported the patient's inability to work given your opinion that her stressful work environment may have resulted in a cardiac event, and that return that [sic] stressful environment could result in relapse.
>
> I noted that I was aware of the stress that the patient experienced in the job she left because of a difficult relationship with her supervisor, and you stated that she had also made you aware of this very stressful former job environment. We agreed that this form of cardiomyopathy usually becomes symptomatic minutes to

hours after an acute life stress.  I shared with you that the records record that her chest pain began on the night before she was admitted to hospital [sic] while she was lying on the couch watching an evening hockey game.  You stated that you were not aware that her symptoms had begun in this setting.

There was no evidence of coronary artery disease by angiography, and wall motion abnormalities and left ventricular function became normal very quickly.

Given the information I shared with you, you agreed it was reasonable for her to return to the same occupation that she had been involved in, but given her perceived stress and conflict with her supervisor, with a different employer.

ECF No. 35-10 at 15.  Dr. MacDougall was given until March 3, 2010, to "add to or correct any statements set forth" in Dr. Lambrew's letter.  *Id.* at 16.  The letter stated that no response was needed if Dr. MacDougall agreed with Dr. Lambrew's summary of the telephone conversation. *Id.*  Dr. MacDougall evidently declined to respond.

Dr. Kletti and Dr. Kang discussed Pini's psychiatric condition on February 26, 2010.

ECF No. 41 at ¶ 136.  In a letter to Dr. Kang about the discussion, Dr. Kletti stated as follows:

- I noted I was calling to clarify your opinion as to any psychiatric impairment

- You clarified that you evaluate Ms [sic] Pini as having understandable anxiety related to her physical health condition [sic]  You noted that your documentation of "significant anxiety and marginal ability to handle stress of any sort let alone work" refers to physical impairment per evaluations of physical care providers

- You noted that Ms [sic] Pini's anxiety complaints are in the context of thinking about return to work.  I noted that Ms [sic] Pini's care providers have recommended she not return to work in her prior specific job, but that Ms [sic] Pini could work in her own occupation for a different employer

- You stated you are not certifying that impairment on the basis of any psychiatric condition

ECF No. 35-11 at 3. Although Dr. Kang was invited to "add to or correct any statements set forth" in the letter, he was advised that no response was otherwise necessary. *Id.*

On March 2, 2010, Unum denied Pini's application for benefits under the LTD Plan. ECF No. 41 at ¶ 139. Unum's decision was communicated to Pini in a letter authored by McDonald. ECF No. 35-11 at 7-12. The Employee Retirement Income Security Act of 1974 ("ERISA") [29 U.S.C. § 1001 *et seq.*] requires a letter denying a participant's application for benefits to "set[] forth the specific reasons for such denial . . . in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). After discussing the relevant medical evidence, McDonald's letter emphasized the distinction between how Pini's job-related tasks were "performed for a specific employer or at a specific location" and how those tasks were typically "performed in the national economy." ECF No. 35-11 at 10. The letter stated that Pini's claim was being denied because her "reasons for not returning to work" were related to a "workplace-specific conflict" and not to an impairment precluding full-time work in the same occupation "for a different employer." *Id.*

The ERISA requires every covered employee benefit plan to provide "any participant whose claim for benefits has been denied" with "a reasonable opportunity . . . for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). McDonald's letter informed Pini that she could appeal the decision denying her claim by writing a letter to Unum's Appeals Unit within 180 days. ECF No. 35-11 at 11-12. A regulation promulgated pursuant to the ERISA requires any letter denying a participant's request for benefits to include "[a] statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(j)(3). McDonald's letter

to Pini contained the required statement.  ECF No. 35-11 at 11.  Pini was encouraged to submit "additional information" to Unum in the event of an appeal.  *Id.*

After Pini's claim was denied, her medical records were reviewed by Vocational/Placement Specialist Jay K. Jarrell ("Jarrell").  ECF No. 41 at ¶ 151.  In a letter to Pini's counsel dated July 19, 2010, Jarrell acknowledged that he was "not qualified to provide a medical opinion" as to whether Pini could engage in certain work-related activities.  ECF No. 35-12 at 10.  Moving on to discuss the expectations of employers throughout the national economy, Jarrell asserted that the work of a product analyst was "inherently stressful."  *Id.* at 12.  Jarrell's review was apparently conducted at the request of Pini's counsel.  *Id.* at 10.

Dr. John S. Gregg, a cardiologist, performed a "cursory physical examination" of Pini on July 22, 2010.  ECF No. 35-12 at 3.  Pini complained of "chest discomfort" when she was "under stress" even though she had not experienced any "signs or symptoms" while hiking or engaging in other strenuous physical activities.  *Id.*  Based on his physical examination and review of the medical evidence, Dr. Gregg concluded that Pini was suffering from Takotsubo cardiomyopathy. *Id.* at 4.  In a letter to Pini's counsel, Dr. Gregg made the following observations:

> Recent data suggested that patients with this syndrome have a reasonably good prognosis.  Having said that, however, patients do have about a 10% incidence of recurrent apical ballooning syndrome and can have continued chest discomfort particularly with stressors.  Quite curiously most of these patients do not have exercise induced abnormalities.  The reason that it [sic] has been postulated by others is that these patients probably have coronary plaques which are confined primarily to the layer of the coronary artery that is called the media or the muscle layer rather than the lining or the intimal layer where most atherosclerotic plaques develop.  Even a small plaque in the muscle layer of the coronary artery once it ruptures that [sic] becomes reasonably susceptible to stresses from then on, probably for the rest of the patient's life.

*Id.*  Dr. Gregg further stated that Pini was "at increased risk of having another myocardial infarction if she continue[d] to be subjected to stresses, particularly the stresses of work."  *Id.* at

5. Moving on to discuss Pini's work-related abilities and limitations, Dr. Gregg concluded his

letter by stating as follows:

> It would be nice to find Mrs. Pini a job where there would be no stress, but apparently such is probably difficult to do, particularly in the kind of economy that we are experiencing right now. It is also likely that such patients once having developed myocardial infarction and normal coronary arteries will find themselves sensitized as I have mentioned before to the stressors of work. In conclusion although the prognosis of acute myocardial infarction with normal coronary arteries is more favorable than that of patients who have a myocardial infarction with atherosclerosis, the prognosis is not necessarily benign, as most patients who have had the apical ballooning syndrome have continued to be prone to coronary spasm due to plaques which have ruptured in the muscle layer of the coronary arteries. On continued exposure to these stressors, which produced the acute myocardial infarction in the first place may [sic] lead this person to recurrent episodes down the road. Most importantly, this patient continues to have chest discomfort similar to what she had before, particularly when she is under stress. It would be my recommendation, therefore, that Mrs. Pini be totally and permanently disabled from any and all occupations. I would believe that the data before me has confirmed the diagnosis of Takotsubo cardiomyopathy (transient apical ballooning syndrome).

*Id.* Dr. Gregg's letter was dated August 4, 2010. *Id.* at 3.

Lawrence Shoup ("Shoup") worked with Pini in the "computer software industry" prior

to her employment with CA. ECF No. 35-12 at 13-14, ¶¶ 3-8. In an affidavit signed on August

17, 2010, Shoup declared that "the job responsibilities required of a product manager in the

software industry [we]re inherently stressful, notwithstanding the political dynamics of each

workplace." *Id.* at 15, ¶ 11. He further asserted that Pini's cardiac condition limited her ability

to perform "the material and substantial duties of a product manager, product coordinator,

development executive, or other comparable position." *Id.* at 15-16, ¶ 14.

Pini appealed the denial of her claim in a letter to Unum dated August 20, 2010. ECF

No. 35-12 at 2. Copies of Jarrell's vocational assessment, Dr. Gregg's examination report and

Shoup's affidavit were sent with Pini's appeal letter. *Id.* at 2-17. Dr. Peter Brown, a psychiatrist

employed by Unum's parent company, completed a "whole person analysis" of Pini's claim on

September 18, 2010. ECF No. 41 at ¶ 155. After reviewing the relevant evidence, Dr. Brown

conveyed the following thoughts:

> The restriction of "avoiding high stress" is unreasonably broad and anti-therapeutic. The restriction to simply avoid stress is, by virtue of its lack of specifiers, extremely stress producing. Stress is ubiquitous and includes both ordinary daily stressors ("hassles") and major like difficulties (eg the death or illness of a family member). The accepted therapeutic approach is to focus on reducing levels of immediate levels of emotional distress and to improve general coping skills (i.e. dealing with stressors more effectively). In the absence of actual treatment notes no assessment can be made of whether appropriate care has been provided.

ECF No. 35-13 at 6. Dr. Brown further explained that Pini's attempt to disassociate her chest

pain from the rigors of "her specific workplace" was "not supported by any clinical evidence

linking more general occupational stresses to identified cardiac events." *Id.*

Dr. Yasmine S. Ali, a consulting cardiologist, is not a salaried employee of Unum. ECF

No. 41 at ¶ 162. Julie E. Hart ("Hart"), a Lead Appeals Specialist for Unum, referred Pini's

claim file to Dr. Ali on September 21, 2010. ECF No. 35-13 at 9. In a written report dated

September 27, 2010, Dr. Ali explained:

> The medical records document complete recovery of left ventricular function, but continued recurrence of "angina" (according to Dr. Moretti's letter of 10/2/09). It is unclear from the available cardiology records what the etiology of these described anginal symptoms is, though Dr. Moretti has documented "coronary spasms" (which is difficult, if not impossible, to tell without corresponding evidence from cardiac catheterization). Without further information regarding these symptoms, it is difficult to comment on physical restrictions and/or limitations with regard to "angina." However, with regard to the diagnosis of stress-induced cardiomyopathy as made by the claimant's physicians, while there do not appear to be physical restrictions and/or limitations at this time, it is not physical activity, but rather stress and emotional events, that is most often implicated in the recurrence of such a syndrome.

ECF No. 35-13 at 13.  Based on her review of the documentary evidence, Dr. Ali stated that

Takotsubo cardiomyopathy was "definitely a possibility in this case."  *Id.* at 12.

Dr. Brown completed another "whole person analysis" on September 29, 2010.  ECF No.

41 at ¶ 168.  Based on his review of the relevant evidence, Dr. Brown concluded that Pini's

allegations of "[o]ccupationally precluding restrictions or limitations [we]re not supported for

either a cardiac or psychiatric condition or for a combination of the two."  ECF No. 35-13 at 30.

He reiterated his view that Pini's alleged need to avoid highly stressful environments was being

framed in "unreasonably broad" terms.  *Id.* at 31.

McDonald's letter of March 2, 2010, stated that Unum would decide any appeal filed by

Pini within forty-five days of its receipt of her appeal letter.  ECF No. 35-11 at 12.  Since Pini's

appeal was filed on August 20, 2010, the forty-five day period was set to expire on October 4,

2010.  In a letter to Pini's counsel, Hart stated that Unum needed an additional forty-five days to

complete its evaluation of the evidence.  ECF No. 35-13 at 36-37.  She requested an extension

lasting through November 19, 2010.  *Id.* at 36.  Pini's counsel did not agree to the proposed

extension.[2]  *Id.* at 36, 48.

In a letter to Pini's counsel dated October 4, 2010, Hart stated that Pini's appeal was

being denied.  ECF No. 35-13 at 39.  The letter explained that the limitations established by Pini

were "specific to her job with her employer."  *Id.* at 42.  Hart's letter also advised as follows:

> As noted above, we did not have the actual cardiac catheterization films or
> psychotherapy records from Ms. Kristoff (dated August 2009 forward) for review.
> If you would like us to consider this information, please provide the records for
> review.  You will have until November 3, 2010.  If we have not received the
> additional information by November 3, 2010, our decision will be final.

---

[2] At that time, Pini was not represented by the attorney who represents her in this case.  ECF No. 35-13 at 36.

*Id.* Pini was specifically informed of her right to challenge Unum's decision in an action brought under the ERISA. *Id.*

Treatment records provided by Kristoff were faxed to Unum on November 2, 2010. ECF No. 35-14 at 37-51; ECF No. 35-15 at 2-11. On November 4, 2010, Unum received compact discs containing Pini's cardiac catheterization films. ECF No. 41 at ¶ 182. The discs were accompanied by Dr. Kang's treatment records. *Id.* The additional information was made available to Dr. Brown. *Id.* at ¶ 183. That information did not change Dr. Brown's mind. *Id.* at ¶ 185. Dr. Brown opined on November 19, 2010, that Pini had established only her inability to return to work with her "particular supervisor" at CA. ECF No. 35-16 at 17.

Dr. Ali viewed Pini's cardiac catheterization films in December 2010. ECF No. 35-16 at 25. In an amended report dated December 22, 2010, Dr. Ali observed:

> The cardiac catheterization films provided clearly show, upon visual review, the apical ballooning of the left ventricle that is typical of Takotsubo (stress-induced) cardiomyopathy. While recurrence is rare, it is not unknown or nonexistent, and there are now several case reports in the literature of recurrence of Takotsubo cardiomyopathy.

*Id.* at 26. Dr. Ali concluded her report by stating that it was "possible" for "stress-induced cardiomyopathy" to recur "in a setting of perceived psychologic[al] stress." *Id.*

The report prepared by Dr. Ali was forwarded to Dr. Brown for review. ECF No. 41 at ¶ 189. On December 30, 2010, Dr. Brown articulated the following conclusion:

> Taken together with the behavioral health information provided a whole person analysis does not support the presence of occupationally precluding restrictions or limitations for any diagnosis or combination of diagnoses. The claimant has a cardiac condition that typically has an excellent prognosis and a low rate of recurrence (i.e. less than 5%). Approximately half of patients with this diagnosis have no identifiable trigger. Significant physical stressors can be identified in about one quarter of patients for about one surface are found psychological stressors (e.g. a grave medical illness in an immediate family member) thought to precipitate the onset in the remainder of the cases. There is no reasonable basis to

assert that the day to day work routine in her own occupation would significantly increase the risk of recurrence. The sole significant stressor identified was what the claimant characterized as a "hellish situation" of her specific job.

ECF No. 35-16 at 32-33. The next day, Pini's counsel was notified that a "final determination" regarding the claim would be rendered within ten business days. *Id.* at 41.

In a letter dated January 5, 2011, Hart informed Pini's counsel that the "additional information" submitted in support of the claim had not changed Unum's prior decision denying the appeal. ECF No. 35-16 at 43. After discussing the medical evidence in the claim file, Hart's letter explained:

The Long Term Disability policy covers Ms. Pini's occupation as it is performed in the national economy, not her specific job as it is required to be performed for a particular employer. While it is reasonable that Ms. Pini was unable to perform her job with her previous supervisor and employer, there is no evidence in her claim file of any occupational restrictions and/or limitations. A vocational review in Ms. Pini's claim file concluded that her occupation of Product Analyst would not require her to exert more than 20 pounds of force, sit more than frequently or walk/stand occasionally.

We have determined that Ms. Pini was not disabled as defined by the policy and the decision to deny benefits on her claim was appropriate.

*Id.* at 44. At the conclusion of her letter, Hart made reference to Pini's right to challenge Unum's decision in an action arising under the ERISA. *Id.* at 45.

Dr. Hunter C. Champion has been an Associate Professor at the University of Pittsburgh's School of Medicine since July 2009. ECF No. 30-12 at 7. He teaches in the Division of Pulmonary, Allergy, and Critical Care Medicine. *Id.* In 2005, an article about stress-induced heart failure authored by Dr. Champion was published in the *New England Journal of Medicine*. *Id.* at 44-53. During the latter part of 2011, Dr. Champion was studying "broken heart" syndrome. ECF No. 41 at ¶ 201.

Dr. Champion examined Pini on December 11, 2011. ECF No. 41 at ¶ 200. In a letter to an unspecified recipient dated April 16, 2012, Dr. Champion gave the following account of the examination:

> On December 11, 2011, I had the opportunity to evaluate Janice C. Pini, whose doctors had provided a diagnosis of stress-induced cardiomyopathy. Records of this evaluation are attached. Briefly, Ms. Pini was in otherwise good health but was working a job that was a major stressor in her life. Both the type of employment as well as the staff with whom she was working were the major source of her stress. She was hospitalized at Canonsburg Hospital with elevated CPK isoenzymes and chest discomfort and was subsequently cathed on June 7, 2009 with normal coronary arteries. Moreover, her echo documented apical ballooning syndrome with and [sic] EF of 40-45%. The cath showed anteroapical and inferoapical akinesis and left ventricular end diastolic pressure of 10 mmHg. She also has experienced this type of angina symptoms as a result of emotional stressors. With the ability to evaluate her prior records, echocardiograms and catheterization data, I was able to refine her diagnosis as Takatsubo-cardiomyopathy, also known as "stress cardiomyopathy" or "broken-heart syndrome." While the most profound presentation of her cardiac manifestations of stress related to her significant drop in cardiac function and enzyme evidence of a heart attack, for more chronic presence of angina that occurs frequently in the setting of emotional stress exemplifies the chronic and lower-level changes in our heart related to the stressor. Patients with Tkatsubo-cardiomyopathy [sic] must avoid stress, including job-related stress, which is likely to trigger another serious and possibly fatal heart failure. Ms. Pini, like other patients with this condition, is advised to avoid stressful situations to the extent possible as another episode of acute heart failure is possible. I have advised her in this regard. If you require any additional information, please do not hesitate to contact me.

ECF No. 30-12 at 7. On April 20, 2012, Pini asked Unum to reopen the administrative record so that Dr. Champion's report could be considered. *Id.* at 4-5. Unum declined to consider the report, since Pini's claim file had already been closed. ECF No. 39 at ¶ 49.

Pini commenced this action against Unum, CA and the LTD Plan on May 24, 2012, alleging that they had violated the ERISA by denying her application for long-term disability benefits. ECF No. 1. The parties filed cross-motions for summary judgment on May 31, 2013. ECF Nos. 29 & 32. Those motions are the subject of this memorandum opinion.

## II.    Jurisdiction and Venue

The instant action arises under the ERISA.  The Court has subject-matter jurisdiction in this case pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(2).  Venue is proper under 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2).

## III.    Discussion

Employee benefit plans are regulated by the ERISA's "comprehensive and complex scheme."  *Estate of Kensinger v. URL Pharma, Inc.*, 674 F.3d 131, 135 (3d Cir. 2012).  Since the LTD Plan at issue in this case provides participants with "benefits in the event of . . . disability," it qualifies as an "employee benefit plan" governed by the ERISA.  29 U.S.C. § 1002(1), (3).  Although the ERISA neither "requires employers to establish employee benefit plans" nor specifies the benefits available under such plans, it does "seek to ensure that employees will not be left emptyhanded once employers have guaranteed them certain benefits."  *Lockheed Corp. v. Spink*, 517 U.S. 882, 887, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996).  In enacting the ERISA, Congress created "a scheme that is built around reliance on the face of written plan documents."  *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995).  In order to protect the legitimate expectations of plan participants, the relevant statutory language provides that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument."  29 U.S.C. § 1102(a)(1).  A fiduciary charged with the duty of administering a plan must act "in accordance with the documents and instruments governing the plan," provided that such "documents and instruments" are consistent with the applicable statutory requirements.  29 U.S.C. § 1104(a)(1)(D); *Kennedy v. Plan Administrator for DuPont Savings & Investment Plan*, 555 U.S. 285, 288, 129 S.Ct. 865, 172 L.Ed.2d 662 (2009).

Section 502(a)(1)(B) of the ERISA, which is codified at 29 U.S.C. § 1132(a)(1)(B), permits a "participant" such as Pini "to recover benefits due to h[er] under the terms of h[er] plan, to enforce h[er] rights under the terms of the plan, or to clarify h[er] rights to future benefits under the terms of the plan." Since Pini seeks "to recover benefits due to h[er]" under the LTD Plan, and to "enforce" and "clarify h[er] rights to future benefits" thereunder, her claims arise under § 1132(a)(1)(B). *Eichorn v. AT&T Corp.*, 484 F.3d 644, 651-653 (3d Cir. 2007). The ERISA provides that "[a]n employee benefit plan may sue or be sued . . . as an entity." 29 U.S.C. § 1132(d)(1). Consequently, Pini can seek a "money judgment" directly against the LTD Plan. 29 U.S.C. § 1132(d)(2). She can also proceed against Unum and CA in their official capacities as plan administrators. *Graden v. Conexant Systems, Inc.*, 496 F.3d 291, 301 (3d Cir. 2007). Claims arising under § 1132(a)(1)(B) can result in an order directing plan administrators to pay benefits from the assets of a covered plan. *Hahnemann University Hospital v. All Shore, Inc.*, 514 F.3d 300, 308 (3d Cir. 2008).

A.     **The Standard of Review**

The ERISA contains no specific language establishing a standard of review for claims brought under § 1132(a)(1)(B). *Haisley v. Sedgwick Management Services, Inc.*, 776 F.Supp.2d 33, 42 (W.D.Pa. 2011). Invoking principles of trust law, the United States Supreme Court explained in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Although the rule established in *Firestone* defaults to *de novo* review when the terms of the plan are silent, it calls for "a deferential standard of review" when "a trustee exercises discretionary

powers." *Firestone*, 489 U.S. at 111. Where such discretionary powers are exercised, "an

employer can rely on the expertise of the plan administrator rather than worry about unexpected

and inaccurate plan interpretations that might result from *de novo* judicial review." *Conkright v.*

*Frommert*, 559 U.S. 506, 517, 130 S.Ct. 1640, 176 L.Ed.2d 469 (2010).

The Defendants bear the burden of establishing the applicability of a deferential standard

of review. *Viera v. Life Insurance Co. of North America*, 642 F.3d 407, 413 (3d Cir. 2011). The

proper standard of review must be ascertained from the terms of the LTD Plan. *Luby v.*

*Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176, 1180 (3d Cir. 1991). The

final two paragraphs of the LTD Plan provide as follows:

> The Plan, acting through the Plan Administrator, delegates to Unum and its
> affiliate UnumProvident Corporation discretionary authority to make benefit
> determinations under the Plan. Unum and UnumProvident Corporation may act
> directly or through their employees and agents or further delegate their authority
> through contracts, letters or other documentation or procedures to other affiliates,
> persons or entities. Benefit determinations include determining eligibility for
> benefits and the amount of any benefits, resolving factual disputes, and
> interpreting and enforcing the provisions of the Plan. All benefit determinations
> must be reasonable and based on the terms of the Plan and the facts and
> circumstances of each claim.
>
> Once you are deemed to have exhausted your appeal rights under the Plan, you
> have the right to seek court review under Section 502(a) of ERISA of any benefit
> determinations with which you disagree. The court will determine the standard of
> review it will apply in evaluating those decisions.

ECF No. 1-1 at 38. The policy language must be construed in accordance with "[o]rdinary

principles of contract interpretation." *US Airways, Inc. v. McCutchen*, 569 U.S. ___, ___, 133

S.Ct. 1537, 1548-1549, 185 L.Ed.2d 654 (2013). Since the LTD Plan unambiguously gives

Unum "discretionary authority to make benefit determinations," its factual findings pertaining to

Pini's medical condition must be accorded deference. *Heasley v. Belden & Blake Corp.*, 2 F.3d

1249, 1256 (3d Cir. 1993).

"The 'arbitrary and capricious' standard is essentially the same as the 'abuse of discretion' standard." *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45, n. 4 (3d Cir. 1993). This deferential standard controls the Court's review of Unum's decision denying Pini's application for long-term disability benefits. *Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 526, n. 2 (3d Cir. 2009). The relevant question is whether that decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Adamo v. Anchor Hocking Corp.*, 720 F.Supp. 491, 500 (W.D.Pa. 1989).

**B.     Unum's Conflict of Interest**

"[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115 (brackets in original), quoting the RESTATEMENT (SECOND) OF TRUSTS § 187, Comment d (1959). In *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 112, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008), the Supreme Court recognized that a "conflict of interest" exists when "a plan administrator both evaluates claims for benefits and pays benefits claims." Although this factor (like any other factor) may "act as a tiebreaker when the other factors are closely balanced," it is of minimal importance when the administrator has taken steps to reduce bias and promote accuracy "by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Glenn*, 554 U.S. at 117. In this vein, the degree to which a conflict of interest may be relied upon to impugn a denial of benefits often depends on the precise nature of the funding arrangement in question. *Post v. Hartford Insurance Co.*, 501 F.3d 154, 162-164 (3d Cir. 2007).

It is undisputed that the LTD Plan is funded through insurance issued by Unum. ECF No. 41 at ¶ 13. For this reason, it is beyond dispute that Unum was operating under a conflict of interest when it denied Pini's claim. *Glenn*, 554 U.S. at 112-115. Where a deferential standard of review applies, a reviewing court may consider only the evidence that was before the plan administrator at the time of its decision.[3] *Sivalingam v. Unum Provident Corp.*, 735 F.Supp.2d 189, 194-195 (E.D.Pa. 2010). This general rule, however, does not preclude the parties from supplementing the record with evidence concerning a particular plan's "actual funding mechanism." *Kosiba v. Merck & Co.*, 384 F.3d 58, 67, n. 5 (3d Cir. 2004).

The record indicates that Dr. Kletti and Dr. Brown were eligible to participate in certain incentive plans available to Unum employees. ECF No. 30-8 at 4, 6-8. Dr. Lambrew and Dr. McDonald were on-site contractors who were paid only at an hourly rate. *Id.* at 4-8. Pini maintains that Dr. Kletti and Dr. Brown had financial incentives to recommend the denial of her claim. ECF No. 31 at 10; ECF No. 38 at 12. Unum asserts that "[b]onuses and compensation are not paid to employees based upon the outcome of any claim decision or any number of claim decisions." ECF No. 40 at 18. The Defendants further contend that Unum has "taken numerous steps to wall off claims personnel from financial decisions." *Id.* at 19. Unfortunately, the exhibits cited by the parties in support of their respective positions simply do not explain the precise nature of Unum's funding arrangement.[4] ECF No. 30-8 at 8-41; ECF No. 30-11.

Since the *extent* of Unum's conflict of interest is not clear from the record, its "case-specific importance" cannot be readily ascertained. *Glenn*, 554 U.S. at 117. In any event, the significance of that conflict turns solely on the degree to which it actually "affected the decision

---

[3] A court reviewing a benefits decision *de novo* has discretion to consider "any supplemental evidence" presented by the parties. *Viera v. Life Insurance Co. of North America*, 642 F.3d 407, 418 (3d Cir. 2011).

[4] Pini has submitted copies of the incentive plans. ECF No. 30-7 at 8-41. Nonetheless, she makes no attempt to explain how those plans created specific incentives for Dr. Kletti and Dr. Brown to recommend that her claim be denied. ECF No. 31 at 10; ECF No. 38 at 12.

to deny benefits." *Howley v. Mellon Financial Corp.*, 625 F.3d 788, 794 (3d Cir. 2010). Although Unum's "structural conflict of interest" must be taken into account, the disposition of this case still turns on "whether a reasonable basis existed for the administrator's benefits decision." *Blankenship v. Metropolitan Life Insurance Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011). The *existence* of Unum's conflict of interest weighs somewhat in Pini's favor. *Glenn*, 554 U.S. at 115-118. In light of the evidentiary record, however, that conflict is not a "determinative factor."[5] *Fleisher v. Standard Insurance Co.*, 679 F.3d 116, 122, n. 3 (3d Cir. 2012).

### C. Unum's Weighing of the Evidence

Pini challenges Unum's decision on the ground that her cardiac condition, when coupled with the "inherently stressful" nature of her occupation, rendered her unable to return to work as a product analyst in the national economy. ECF No. 31 at 11-12; ECF No. 38 at 2-6; ECF No. 42 at 1-3. At the outset, a few preliminary points are worth noting. Pini does not contend that her medical condition directly prevented her from performing the tasks expected of a product analyst during the period of time in question. In the aftermath of her cardiac event, she was able to engage in strenuous physical activities without exhibiting "signs or symptoms" of heart disease. ECF No. 35-12 at 3. Dr. Moretti reported that Pini was not suffering from a psychiatric impairment. ECF No. 35-7 at 31. In essence, Pini's entire claim for benefits is based on a *prediction* that she would suffer a heart attack if she were to return to her "regular occupation." ECF No. 38 at 4; ECF No. 42 at 1.

_____

[5] A conflict of interest is relevant to the analysis only because an administrator's "fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary." *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 112, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). The existence of a conflict of interest does not provide a basis for disturbing a "reasonable" decision denying an application for benefits. *Blankenship v. Metropolitan Life Insurance Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011)(explaining that a conflict of interest does not alter the "basic analysis," which centers on "whether a reasonable basis existed for the administrator's benefits decision").

In *Lasser v. Reliance Standard Life Insurance Co.*, 344 F.3d 381, 391, n. 12 (3d Cir. 2003), the United States Court of Appeals for the Third Circuit recognized that a risk of "future injury" induced by stress can sometimes create a "present disability." A claimant seeking benefits on such a theory need not "provide statistics detailing the harm that working in his [or her] regular occupation might precipitate." *Lasser*, 344 F.3d at 391. Once he or she "makes a *prima facie* showing of disability through physicians' reports," the claims administrator bears the burden of supporting its decision to reject those reports with evidence suggesting that the risk of future harm is not great. *Id.* Pini contends that she has "made a *prima facie* showing of disability" by demonstrating her need to avoid "stress," and that Unum has failed to adequately "support the basis of its objection." ECF No. 38 at 19.

The argument advanced by Pini is problematic because, as Dr. Brown pointed out, "[s]tress is ubiquitous." ECF No. 35-13 at 6. It is virtually impossible for a human being to avoid all forms of stress. The relevant question is whether the *particular* form of stress identified by Pini (*i.e.*, the stress experienced by anyone working as a product analyst) was likely to trigger a cardiac event in her precise situation. *Lasser*, 344 F.3d at 391, n. 12 (observing that "whether risk of future effects creates a present disability depends on the probability of the future risk's occurrence").

As an initial matter, neither Fletcher nor Letichevsky described the work of a product analyst as "inherently stressful." That characterization of Pini's occupation was articulated by Jarrell and Shoup, both of whom were speaking on her behalf. ECF No. 35-12 at 12, 15. Fletcher stated that a product analyst typically needed to multi-task at an above-average pace, respond to deadlines, and handle high workloads. ECF No. 35-4 at 44. Letichevsky reported that a product analyst would be expected to perform a variety of duties, make judgments and

decisions, and influence the opinions, attitudes and judgments of others. ECF No. 35-6 at 30. The duties described by Fletcher and Letichevsky would presumably exceed the restrictions articulated by Dr. Moretti and Kristoff. ECF No. 35-4 at 14, 25-26. Nonetheless, it is not necessarily true that they would entail the type of "stress" that would cause Pini to suffer a heart attack. *Lasser*, 344 F.3d at 391, n. 12.

In his September 30, 2009, letter to Merrifield, Dr. Waheed stated that Pini "would not be able to perform [her] job any further" if "anxiety and stressful situations [could] not be avoided in her work environment." ECF No. 35-4 at 19. Two weeks later, Pasquali asked Dr. Waheed to clarify the statements contained in his letter. *Id.* at 22. When asked to identify the "specific stressors" affecting Pini's work capacity, Dr. Waheed made specific reference to Pini's interactions with her supervisor. *Id.* at 23. Dr. Waheed further stated that Pini would be alright "as long as she avoid[ed] *this type of stress*," and that "she should be able to" perform the duties of her occupation for a different employer. *Id.* (emphasis added).

The record of Dr. Moretti's January 5, 2010, conversation with Dr. Kletti suggests that Dr. Waheed had "encouraged [Pini] not to let her symptom complaints interfere with [her] premorbid functional activities." ECF No. 35-7 at 48. Dr. Moretti apparently recommended that Pini obtain a "second opinion" from a different cardiologist for her own "therapeutic benefit." *Id.* He suggested that reassurance from a "second cardiologist" would alleviate Pini's "understandable anxiety and concern about her chest pains." *Id.* On January 7, 2010, Pini informed Unum that she would be seeking treatment from a new cardiologist because she was "not happy with the treatment" provided by Dr. Waheed. *Id.* at 50.

McDonald spoke with Pini about the status of her claim on January 12, 2010. ECF No. 41 at ¶¶ 103-106. Unum's record of that conversation reads as follows:

> EE stated that she last saw Dr. Waheed towards the end of December. EE stated that she had gone to see Dr. Moretti 12/1 and he sent her back to the cardiologist. EE stated that Dr. Waheed told her the spasms aren't bad enough to progress to a heart attack, but they will go away over time. EE stated that she told him that he told us that she is OK and she doesn't think she is. EE asked AP if she went back to work in a stressful situation if she could get more severe spasms and he said yes. EE stated that she asked if that could lead to another heart attack and he said yes. EE stated that the AP is telling her one thing and Unum another thing. EE stated that her AP is basically saying that she could RTW and if she has more problems stop, but EE stated that she doesn't think that is an OK risk.

ECF No. 35-8 at 30-31. This notation suggests that Pini was subjectively afraid to return to work even though Dr. Waheed believed that she was able to do so. Pini's differences with Dr. Waheed apparently led her to seek a "second opinion" from Dr. MacDougall. ECF No. 35-7 at 48.

Dr. MacDougall examined Pini on January 20, 2010. ECF No. 35-9 at 37. After completing the examination, Dr. MacDougall noted that the possibility of a relapse was "certainly a reasonable concern" in the event that Pini returned to a "stressful work environment." *Id.* Describing Pini's "work future" as "uncertain," Dr. MacDougall encouraged her to pursue "healthy lifestyle habits." *Id.*

On February 17, 2010, Dr. Lambrew provided Dr. MacDougall with additional information about the manner in which Pini's cardiac event had transpired. ECF No. 35-10 at 15. Dr. MacDougall was made aware of the conflict that Pini had experienced with her supervisor. *Id.* Dr. Lambrew also told Dr. MacDougall that Pini's chest discomfort had first manifested itself while she was watching a hockey game. *Id.* The conversation apparently led Dr. MacDougall to conclude that Pini would be able to work as a product analyst for a different supervisor. *Id.*

Pini's application for long-term disability benefits was denied on March 2, 2010. ECF No. 41 at ¶ 139. On July 22, 2010, Dr. Gregg performed a "cursory physical examination" of

Pini.  ECF No. 35-12 at 3.  After completing the examination, Dr. Gregg declared Pini to be "totally and permanently disabled from any and all occupations."  *Id.* at 5.  Dr. Gregg's opinion appears to have been based on an assumption that Pini would not be able to find a job which did not entail some exposure to stress.  *Id.*  Pini's appeal was filed on August 20, 2010.  ECF No. 35-12 at 2.  Dr. Brown found the restriction precluding exposure to stress to be "unreasonably broad and anti-therapeutic," given the "ubiquitous" nature of stress.  ECF No. 35-13 at 6.  Dr. Ali suggested that more information was needed to determine the extent of Pini's limitations.  ECF No. 35-13 at 13.  Pini's counsel, however, refused to consent to an extension of the applicable appeal period.  *Id.* at 36, 48.  Unum denied the appeal on October 4, 2010.  *Id.* at 39-43.

Pini was given until November 3, 2010, to provide her "actual cardiac catheterization films" for Unum's consideration.  ECF No. 35-13 at 42.  Compact discs of the films were later received by Unum.  ECF No. 41 at ¶ 182.  After viewing the films, Dr. Ali concluded that Pini had presented objective evidence of Takotsubo cardiomyopathy.  ECF No. 35-16 at 26.  In an amended report, Dr. Ali stated that it was "possible" for "stress-induced cardiomyopathy" to recur "in a setting of perceived psychologic[al] stress."  *Id.*  Nevertheless, she noted that "recurrence" of Takotsubo cardiomyopathy was "rare" even though it was not "unknown or nonexistent."  *Id.*  Since individuals with Pini's condition "typically ha[d] an excellent prognosis and a low rate of recurrence," Dr. Brown opined that "no reasonable basis" existed for concluding that Pini's return to her own occupation would "significantly increase [her] risk of recurrence."  *Id.* at 33.  Unum reaffirmed its denial of Pini's claim on January 5, 2011.  *Id.* at 43-46.

In the present context, the Court is not free to substitute its own view of the evidence for Unum's factual findings.  *Orvosh v. Program of Group Insurance*, 222 F.3d 123, 129 (3d Cir.

2000).  The relevant inquiry turns on the *reasonableness* (rather than on the *correctness*) of

Unum's decision.  *Conkright*, 559 U.S. at 521-522.  Under the circumstances of this case, the

existence of a disability was dependent upon the *probability* that Pini would suffer a relapse if

she were to work as a product analyst for an employer other than CA.  *Lasser*, 344 F.3d at 391,

n. 12.  Dr. Waheed, who treated Pini in the aftermath of her cardiac event, expressed the view

that she could perform the duties of her occupation for a different employer.  ECF No. 35-4 at

23.  Dr. MacDougall apparently came to the same conclusion after speaking with Dr. Lambrew.

ECF No. 35-10 at 15.  Dr. Ali merely concluded that a recurrence of Pini's "stress-induced

cardiomyopathy" was a *possibility* in the event that she were to place herself in "a setting of

perceived psychologic[al] stress."  ECF No. 35-16 at 26.  Since Dr. Ali observed that

"recurrence" of such a condition was *rare*, she evidently did not believe that it was *probable* that

Pini would suffer a relapse.  *Id.*  Furthermore, Unum was not required to accord special

deference to Dr. Gregg's assessment.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822,

825, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).  Since Dr. Waheed stated that Pini could perform

the duties of her occupation for a different employer, Unum's decision denying her application

for long-term disability benefits cannot be fairly characterized as "unreasonable."

 In determining that Unum's factual findings cannot be disturbed, the Court is guided by

the reasoning employed in *Fergus v. Standard Insurance Co.*, 27 F.Supp.2d 1247 (D.Or. 1998).

In that case, the United States District Court for the District of Oregon was presented with a

situation in which a claimant with a heart condition had been advised by his treating physicians

to change occupations in order to "accommodate a less stressful lifestyle."  *Fergus*, 27 F.Supp.2d

at 1250.  Although several medical consultants agreed that the claimant "would probably benefit

from an occupational change," they opined that he was not precluded from continuing to work in

his own occupation. *Id.* at 1250. The plan administrator responsible for determining the claimant's entitlement to benefits concluded that he could perform the duties of his own occupation for a different employer even though he could no longer work under "an abusive and demeaning superior who was impossible to satisfy." *Id.* at 1254. The District Court held that the plan administrator had not abused its discretion in deciding to credit the opinions of the consultants over those of the claimant's treating physicians. *Id.* at 1255. Since Unum's decision denying Pini's application for benefits was based primarily on information provided by her *treating cardiologist*, the rationale adopted in *Fergus* applies with special force in this case. ECF No. 35-4 at 23. The fact that other physicians later disagreed with Dr. Waheed's assessment is of no dispositive significance. When a plan participant's ability to perform work-related tasks is confirmed by his or her own physician, a plan administrator need not "refer the participant to additional physicians in quest of one who will find a disabling condition." *Wallace v. Reliance Standard Life Insurance Co.*, 318 F.3d 723, 724 (7th Cir. 2003).

Relying on *Demaree v. Life Insurance Co. of North America*, 789 F.Supp.2d 1002 (S.D.Ind. 2011), Pini asserts that her treating physicians were wrongfully "pressed" into agreeing with Unum's medical consultants. ECF No. 31 at 13-14. In *Demaree*, the United States District Court for the Southern District of Indiana expressed concern that consulting physicians had improperly influenced and mischaracterized the conclusions expressed by a claimant's treating physicians. *Demaree*, 789 F.Supp.2d at 1016. In this case, however, Dr. Waheed clearly opined that Pini could perform the duties of her own occupation for a different employer. ECF No. 35-4 at 22-23. It was Dr. Waheed, rather than a medical consultant retained by Unum, who identified Pini's supervisor as the specific source of her work-related stress. ECF No. 35-4 at 23. Dr. Waheed completed Unum's form in his own handwriting. *Id.* at 22-23. Moreover, the questions

asked of Dr. Waheed appropriately tracked the LTD Plan's definition of the term "disability." ECF No. 1-1 at 13, 27, 29; ECF No. 35-4 at 22-23. The record indicates that Pini terminated her treatment relationship with Dr. Waheed because she disagreed with his statements to Unum. ECF No. 35-7 at 50; ECF No. 35-8 at 30-31.

The statements attributed to Dr. MacDougall in Dr. Lambrew's letter of February 17, 2010, present a closer call. According to Dr. Lambrew, Dr. MacDougall "agreed" that it was "reasonable" for Pini to return to her own occupation, provided that she worked for a different employer and had no contact with her supervisor at CA. ECF No. 35-10 at 15. Although Dr. MacDougall was invited to "add to or correct any statements set forth" by Dr. Lambrew, he declined to do so. *Id.* at 16. Echoing language used by the United States District Court for the Western District of Michigan in *Rabuck v. Hartford Life & Accident Insurance Co.*, 522 F.Supp.2d 844, 879 (W.D.Mich. 2007), Pini describes Dr. Lambrew's account of Dr. MacDougall's comments as "manipulative and incredible." ECF No. 42 at 3. The situation in *Rabuck* was different because the plan administrator's questionable characterization of the cardiologist's statements was in direct conflict with an earlier statement that had been prepared by the same cardiologist. *Rabuck*, 522 F.Supp.2d at 880. The same cannot be said in this case. Although Dr. MacDougall acknowledged on January 21, 2010, that Pini's "[r]eturn to a stressful work environment [could] result in a relapse," he did not clearly preclude the possibility that she could perform the duties of her occupation for a different employer. ECF No. 35-9 at 34. Since Dr. Waheed had previously identified Pini's supervisor as the source of her stress, the statements attributed to Dr. MacDougall by Dr. Lambrew were not inherently inconsistent with Dr. MacDougall's earlier remarks. ECF No. 35-4 at 23.

Pini asserts that Unum cannot rely on "hearsay statements" to justify its denial of her claim. ECF No. 42 at 3. To the extent that Pini believes that any "hearsay" contained in the record must be disregarded, she is mistaken. In determining whether a plan participant is eligible for benefits, a plan administrator is not bound by the Federal Rules of Evidence. *Speciale v. Blue Cross & Blue Shield Association*, 538 F.3d 615, 622, n. 4 (7th Cir. 2008). The Court's review of Unum's decision must account for the entire administrative record. *Black v. Long Term Disability Insurance*, 582 F.3d 738, 746, n. 3 (7th Cir. 2009). Furthermore, Pini's suggestion that "hearsay statements" are inherently unreliable cuts in both directions. Since the administrative record consists of business records rather than deposition transcripts, the Court is left with nothing more than a paper trail. Admittedly, the record does not contain sworn testimony confirming the content of Dr. Lambrew's conversation with Dr. MacDougall, making it difficult to ascertain the manner in which Dr. Lambrew may have influenced (or mischaracterized) Dr. MacDougall's opinion. The same could also be said, however, of Pini's conversations with her treating physicians. The record indicates that Pini terminated her treatment relationship with Dr. Waheed because she disagreed with statements that he had given to Unum. ECF No. 35-7 at 48-50; ECF No. 35-8 at 30-31. While a consultant retained by a plan administrator may have an incentive to facilitate a finding of non-disability, it is equally true that a treating physician may have a similar incentive to facilitate a finding of disability. *Nord*, 538 U.S. at 832. The Court cannot assume that certain portions of the administrate record are unreliable simply because they are not favorable to Pini. Since Unum's factual findings are "reasonable" in light of the existing record, they cannot be disturbed. *Conkright*, 559 U.S. at 521.

In the absence of new medical evidence, a plan administrator's reversal of an earlier decision awarding benefits to a claimant constitutes an "irregularity" that counsels in favor of

finding an abuse of discretion. *Miller v. American Airlines, Inc.*, 632 F.3d 837, 848 (3d Cir. 2011). Pini asserts that Unum abused its discretion by denying her application for benefits under the LTD Plan after awarding her benefits under the STD Plan. ECF No. 31 at 14-15. The Court acknowledges that Unum continued to pay Pini short-term disability benefits through December 5, 2009, even though Dr. Waheed had already opined that Pini could work as a product analyst for an employer other than CA. ECF No. 35-4 at 37. It is also worth noting that the definition of the term "disability" found in the LTD Plan is not materially different from that contained in the STD Plan. ECF No. 1-1 at 13, 27, 29; ECF No. 30-5 at 7. Under the present circumstances, however, Unum's denial of Pini's application for long-term disability benefits cannot be reasonably characterized as an abuse of discretion merely because short-term disability benefits had previously been awarded. Unum conducted an ongoing investigation into Pini's condition. Pini's application for benefits under the LTD Plan was *never* approved. Although the ERISA strives to "offer employees enhanced protection for their benefits," it does not "create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place." *Varity Corp. v. Howe*, 516 U.S. 489, 497, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). The statutory framework should not be applied in such a way as to give employers perverse incentives to "reduce benefits." *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). If Unum's decision to deny Pini's application for long-term disability benefits were to be treated as an abuse of discretion simply because her short-term disability benefits were not terminated *immediately* after Unum's receipt of Dr. Waheed's assessment, a plan administrator in Unum's position might be tempted to prematurely terminate a claimant's benefits in order to forestall a subsequent determination that an unjustified "change in position" has occurred. The Court will not accept Pini's invitation

to treat her receipt of benefits under the STD Plan as a "straitjacket" requiring Unum to award her further benefits under the LTD Plan. *Foley v. IBEW Local Union 98 Pension Fund*, 271 F.3d 551, 558 (3d Cir. 2001).

### D. The Adequacy of Unum's Review of Pini's Application

Section 502(a)(3) of the ERISA, which is codified at 29 U.S.C. § 1132(a)(3), permits a "participant, beneficiary, or fiduciary" to bring a civil action seeking "to enjoin any act or practice which violates any provisions of [the ERISA] or the terms of [a] plan," or "to obtain other appropriate relief" designed to "redress such violations" or "enforce" the relevant statutory provisions or plan terms. 29 U.S.C. § 1132(a)(3). Pini's complaint includes claims arising under § 1132(a)(3). ECF No. 1 at ¶¶ 73-78. Those claims appear to be based on Unum's alleged failure to provide Pini with "adequate notice in writing" of its reasons for denying her claim, and on its alleged failure to conduct a "full and fair review" of her appeal. 29 U.S.C. § 1133(1), (2).

A regulation promulgated pursuant to the ERISA requires a letter initially denying an application for benefits to include "[t]he specific reason or reasons for the adverse determination," "[a] description of any additional material or information necessary for the claimant to perfect the claim," and "an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g)(1)(i), (iii). Pini contends that McDonald's letter of March 2, 2010, failed to convey the relevant information. ECF No. 31 at 16-17. A close examination of the record, however, reveals that Unum complied with the applicable procedural requirements. The medical information supporting Unum's decision consumed three pages of McDonald's six-page letter. ECF No. 35-11 at 8-10. Pini was advised that she could submit "written comments, documents, or other information" in the event that she decided to appeal. *Id.* at 11. The letter did not make it difficult for Pini to understand or challenge Unum's decision.

*Miller*, 632 F.3d at 852-853. Since McDonald's letter provided Pini with enough information to facilitate a meaningful appeal, it satisfied Unum's procedural obligations. *Hobson v. Metropolitan Life Insurance Co.*, 574 F.3d 75, 87-88 (2d Cir. 2009).

A plan administrator's failure to procure an independent medical examination of a claimant before denying his or her application for benefits may "raise questions about the thoroughness and accuracy of the benefits determination." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). Pini intimates that Unum abused its discretion in failing to have her undergo such an examination. ECF No. 38 at 13. Nevertheless, the documentary evidence indicates that Unum decided not to request another examination because Dr. Moretti had already referred Pini to Dr. MacDougall. ECF No. 35-7 at 51. The referral apparently occurred because Dr. Waheed had "encouraged [Pini] not to let her symptom complaints interfere with [her] premorbid functional activities." *Id.* at 48. Since Pini's treating cardiologists agreed that she could work as a product analyst for a different employer, Unum was not required to arrange for a separate physical examination. *Wallace*, 318 F.3d at 724.

The Defendants acknowledge that Dr. Champion's report was never considered in connection with Pini's claim. ECF No. 33 at 10, n. 1. That report was submitted to Unum more than a year after the closure of Pini's claim file. ECF No. 30-12 at 4-5. Unum declined to reconsider Pini's application for benefits. ECF No. 35-17 at 41-42. Nothing in the ERISA required Unum to consider additional evidence at such a late date. Unum fulfilled its obligation to provide Pini with a "full and fair review" of her claim. 29 U.S.C. § 1133(2). It was not required to continue receiving evidence into infinity. *Edwards v. Briggs & Stratton Retirement Plan*, 639 F.3d 355, 362-363 (7th Cir. 2011)(recognizing the prerogative of a plan administrator to enforce administrative deadlines that comply with the ERISA's requirements).

IV.     **Conclusion**

Under the LTD Plan, Pini's "regular occupation" was not defined in relation to how her work tasks were "performed for a specific employer or at a specific location." ECF No. 1-1 at 31. According to Dr. Waheed, the "specific stressors" impacting Pini's ability to work were her interactions with a specific supervisor employed by CA. ECF No. 35-4 at 23. Unum's evidentiary basis for denying Pini's application for long-term disability benefits was not arbitrarily divined. It was provided by Pini's treating cardiologist.

The Court has no mandate to substitute its own judgment for that of Unum. *Lucash v. Strick Corp.*, 602 F.Supp. 430, 434 (E.D.Pa. 1984). No opinion is expressed as to whether Unum *correctly* ascertained Pini's work-related abilities and limitations. It suffices to say that Unum's factual findings are *reasonable* enough to warrant deference. *Firestone*, 489 U.S. at 111. The motion for summary judgment filed by Pini (*ECF No. 29*) will be denied, and the motion for summary judgment filed by the Defendants (*ECF No. 32*) will be granted. An appropriate order follows.

McVerry, J.


cc:     All counsel of record

41

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANICE C. PINI, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **2:12-cv-00698** |
| | ) | |
| FIRST UNUM LIFE INSURANCE | ) | |
| COMPANY, THE CA, INC. GROUP | ) | |
| LONG TERM DISABILITY PLAN, | ) | |
| AND CA, INC., | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

AND NOW, this 5th day of November, 2013, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED** and **DECREED** that the

Plaintiff's Motion for Summary Judgment (*ECF No. 29*) is **DENIED**, and that the Defendants'

Motion for Summary Judgment (*ECF No. 32*) is **GRANTED**.  The Clerk is directed to docket

this case as closed.

BY THE COURT:


s/Terrence F. McVerry
United States Senior District Judge

cc:     All counsel of record